The next case is number 07-1203, Betazan Fabric against Dentsply International. Mr. Dillard, whenever you're ready. Thank you, Your Honor. I would like to begin by addressing the question of whether or not the district court was correct in finding plaintiffs' evidence of infringement to be legally insufficient on the basis that it compared the accused products with a commercial embodiment of a plaintiff. There were actually two... Mr. Dillard, let me ask you one thing. Exactly what kind of claims do we have here? We're in this little Atlantic thermoplastic scripts debate. Now, what sort of claims do you say these were? I mean, the district court judge really called them product claims, correct? Yes. Lined with Atlantic... I mean, lined with scripts. But there is... there did seem to be some language in the prosecution history or a statement in the prosecution history, I'm thinking at 926, where it appears that granting of the claims was premised on the process limitations. Yes. The claims are product by process claims. The process limitations are a method for selecting the colors that make up the set of dental colored materials which are claimed. And it's a conceptual process for selecting colors within the tooth color space. And what it is is a way of claiming the color relationships, the colors and the color relationships of the set of dental colored materials. And if the set of dental colored materials have the relationships as required by the claims, we believe that that's an infringement of the product. Doesn't it... does this... do you agree or disagree with the proposition that this prosecution history reference at 926 seems to suggest, and tell me you think I'm wrong, that the process steps are limitations? Oh, I disagree with that, Your Honor. I believe that the process steps are a way of characterizing the interrelationships of the colors that are required by the set of dental colored materials. But that... Would the process have to be met for there to be infringement? No. And in fact, in this case, we believe that the set of dental colored materials that are accused meet the color limitations by virtue of the fact that they're intended to be and are copies of plaintiff's shade guide, which is called a 3D Master Shade Guide. The 3D Master Shade Guide is not an embodiment of these specific claims, but it is an embodiment of other claims within the patent. And it has the same... it has what we believe are the color relationships required by the claims. In fact, the reason that our evidence of infringement was this comparison with the 3D Master Shade Guide is twofold. One, the accused products were designed to match the colors of the shade guide. And the shade guide is used by dentists to determine the color of a restoration. They send the color designation to a dental lab. They make up the restoration. They check it against, again, the shade guide to make sure that it's accurate. Send it back to the dentist and they put it in the patient's mouth. Additionally, the evidence that we submitted to the court showed that the color relationships of the 3D Master Shade Guide met the claim limitations reflecting or requiring the particular color relationships. And the reason we did that, of course, is that the shade guide was the target of the colors for the accused products. And the shade guides necessarily have to be consistent in order to be usable. You can't have colors that fluctuate. Otherwise, you send something into a dental laboratory, you're going to get something totally different coming back. It's got to be consistent. There's years and years of data and use of the shade guide. And we believe that showing that the shade guide had the color relationships and showing that the accused infringing materials were designed to match and, in fact, did match the colors of the shade guide establishes that the accused materials have, in fact, the color relationships as required by the claims. They say that if, in fact, reading the claims so that the colors have to fall on the straight line, and wasn't it undisputed that their colors were off the line at least within, or do we need to think about the margin of error? Is that the answer to that? We definitely need to think about the margin of error. If I could ease into that, the district court, in deciding that the comparisons were improper, did discuss the Glaxo case. And the Glaxo case was one in which the plaintiff's expert used a compound provided by the plaintiff, it was a plaintiff's embodiment, to develop an IR spectrum showing the claimed 29 peaks that were required by the claims in that case. Then they ran a spectrum of the accused product and compared the peaks, and the expert concluded that the accused product had all the claimed 29 peaks. That was disputed, but the court held that what that created was a genuine issue of fact. In our case, the district court noted that, here there is no certainty that Avita's commercial embodiment produces a unique benchmark, in the same sense that an infrared profile for a given element will produce a unique profile. I'm having a hard time reading my notes. And what the district court did was apparently recognize that you can actually prove infringement indirectly by using a control and comparing something to a control. In this case, the control, or also the target, happens to be a commercial embodiment of a client. But nevertheless, it's still probative. Now, the district court decided that the spectroscopy methodology used in Glaxo was much more accurate than the methodology that was being used in our case. In your case, it was what, purely visual inspection? Well, there's two ways that you can do it, and you can do it by spectroscopy, spectro-colorimetry, or visual comparison to a standard. And what we submitted to the court was evidence, including a great deal of testimony from defendants' own experts, that spectrophotometric measurements for these types of materials, which are translucent materials, is not, he would consider accurate, but there is a tolerance level. And the tolerance level turns out to be about the same as the visual perception level. There's a color difference indicator or calculation that comes out in delta E. There's a formula for it, but the ability to perceive colors, you can see different colors if they're different enough that they have a delta E of 2. But the same expert also said that even if you take the same sample with the same machine, and you run two spectrophotometric readings, you can get an error of up to delta 2. So for these types of materials, the instrumentation accuracy is not as great as we typically think of it. Certainly, the district court, I think, showed a bias towards instrumentation when he talked about the accuracy of the IR spectrum in Glaxo. We have no idea what the actual accuracy was. It was challenged, if I can remember correctly, IR spectrums have a bunch of peaks and valleys and noise, and so it may or may not be very easy to discern whether or not there were 29 peaks or not. But that was an issue of fact to be tried by the jury. Here, the evidence, including the actual raw data of the two sets of spectrophotometric data that were taken on the dependence materials, show that there is a large range of, I won't say error, just difference. Dr. White, a dependence expert, also mentioned that if you take two different people fabricating materials, fabricating restorations from dependence materials at two different times, two different locations, using two different machines, you're going to come up with very large, or you could come up with very large differences. And that's exactly what the actual raw data shows, and we've pointed that out in our brief, that if you actually compare the spectrophotometric measurements that defendants took with those that plaintiffs took, in some cases, they're pretty close. Other cases, they're very disparate, and in some cases, even the relationship of the colors is different, where you have... How do you correlate that with the invention? Can you summarize very briefly what it was that was invented over the prior art? What was invented was a reasonably small number of colors that could be used in dental colored materials to create all of the dental restoration colors that we want, either by the direct color or by mixing. But it would be a limited number of colors that could do all the different colors for restorations. Well, I'm just thinking as to where the novelty was and how that correlates with what you've just said, that there was an inability to measure, because of instrumentation limitations, exactly where the differences are. Well, first of all, there's not an inability, it's just that you need to recognize that there are tolerances with either approach, either the visual approach, which is Delta IIe, or the spectrophotometric approach, which is the same, depending on if you have all the criteria of the same sample and so forth. The novelty is that you've got this limited number of... Actually, this particular invention was an improvement over a prior invention that was similar, but the central colors need to be offset from the vertical luminance axis. That's one of the items that is required by these claims. Because of that, you can get even more accurate color determination and use a limited number of colors in order to fulfill the entire range of colors that you would need to be able to do all the restorations. Okay. All right. We'll save your full rebuttal time, Mr. Diller. Mr. Shuman? May it please the Court, Brett Shuman on behalf of the Akali Dense Body. Judge Newman, I want to start with your question, because Mr. Diller did not answer it, and that's the question about being able to draw a straight line. The invention here, such as there was one, was concerning the relationship between 26 colors. One of the relationships defined in the patent, one of the limitations of the patent, is that the central colors on these distinct planes of luminance need to be capable of being connected by a straight line. You can draw a straight line between them, offset three degrees to normal, through the color space. And your question was, wasn't there undisputed evidence here that that straight line couldn't be drawn? And the answer is yes. It comes from two places, but most importantly, from their witness, Vita's witness, a deposition was given the plots of the data that Vita did. This has nothing to do with Dense Body's evidence. These are Vita's measurements. Vita plotted them. And Ms. Albarski... But I understood the answer to be, and also from the briefs, maybe you can't draw a straight line between the points, but if you enlarge the points with the margin of error in the measurement, then perhaps the straight line would cover those points. Well, I think that goes to a different issue regarding whether the points lie at the intersections of this regular grid of lines. No, whether or not they're at the intersections. Right, but that's a separate limitation. There are three separate limitations in these product by process claims. The first limitation was that the colors be distributed along distinct luminance levels, five distinct luminance levels. And in our brief, we argue, and I'd be happy to cover again why the data shows, Vita data shows that the distinct luminance levels are not there. The second limitation is that the color points fall on the intersections of the regular grid of lines. And I think that's the limitation that your question was just referring to. The third limitation, and as we know, there has to be a tribal issue of fact about each limitation or summary judgment was appropriate. And Judge Selna properly found no disputed issue of fact, no material dispute of fact, regarding the third limitation, which is the ability to draw a straight line. Dr. Albarski, and I'm referring here to page 2041 of the appendix. This is a Vita document where at deposition she took a green pen and attempted to draw a straight line. And she couldn't. And the court will see on that page that it is nowhere near a straight line and couldn't be a straight line. And in her deposition testimony itself regarding this drawing, she says unequivocally, it is not a straight line. That limitation, that's undisputed evidence that the limitation is not met and summary judgment was appropriate, even before we talk about any of the other limitations in the patent. Furthermore, regarding the straight line. But their answer to that was that if you draw the margin of error around the points, that they can be connected with a straight line. Well, their position is visually there's a margin of error and we can match visually. But the patent, and this is a literal infringement case, remember, only a literal infringement case, the patent speaks in very particular terms and the claims as they were construed requires the points to be on the longitudinal axis. Not at or around the longitudinal axis, on the longitudinal axis. And this was the judge's claim construction, which was actually undisputed. The judge accepted Vita's product limitations regarding these product by process claims. And what he said, the limitation that we are now engaging about must be located on the longitudinal axis of the elongate body. It's A67. It's not at or around within some margin of error. And what happened here is Vita took spectrophotometric measurements of Densply's products. Those measurements showed no infringement as demonstrated by Vita's own witnesses. And so what Vita has done is come up with this visual comparison theory. But visual comparison, and I think I will turn to that theory because the dispute here and the issue is not regarding whether a visual comparison in a case like Glaxo, which was a very different type of comparison, of course. It was a software program that measured the infrared spectrum of a pharmaceutical compound, not visual comparison of color. But that's not the issue here. The issue is the results of that visual comparison show no infringement. The testimony that they're relying on for visual comparison, Dr. Albarski, who visually compared the shade guide with the Densply products, her testimony was that 17 of the 26 colors are a good match. Nine of the colors were not a good match. Her testimony regarding the 26 Opatious Dentin products was that 14 of them were a good match and the other 12 were not. That's 47% of the colors did not match. That is an admission of no literal infringement, even under their visual comparison approach. But that's very interesting because I didn't think that anybody disputed that your client's products fit with this system of measuring color or of observing color. Actually, Your Honor, that is the crux of the dispute. Our products are capable of being used in a different way to make restorations that match the shade guide. The shade guide itself is intended just to capture the universe of color of people's teeth. The process by which you mix the dental color materials, which is what we're talking about here, the claims here only involve the dental color materials, to match the shade guide. One can do that in the claimed way, that is the relationships between the colors that the 157 patent claims, or any of a number of different ways. And what Densply does is it has dental color materials that do not have the color relationships in the patent, but which can be mixed together to make teeth. So let me ask you, I asked Mr. Dillard when he first was at the podium what kind of claims these were. And we discussed a little bit the material at 926 of the joint appendix. Is it your view that these claims, in order to be met, an accused product has to perform the process? Well, that is our position. It's stated in our brief as an alternative basis for affirmance. The debate between Scripps and Atlantic Thermoplastics is an interesting one. It's come up from time to time. As we briefed it, I don't really think it's present here either because here we have all the prosecution history, which Your Honor refers to. So we're not really talking about when you don't have that prosecution history whether product by process claims are limited by the steps. It is. You're saying the process steps are limitations here because of that prosecution history. Correct. Correct. But Judge Sheldon took a different approach. He said if it's a – he judged it on a product basis, correct? Correct. And then he adopted product characteristics submitted by VITA and undisputed, which are the ones which his summary judgment order follows under. And they are – the limitations come from the process steps. The product limitations are drawn from the process steps in the claim. And those are the ones we were talking about with the three limitations. And so we don't meet those. It's undisputed that dense splice dental color materials do not meet at least two, and as we've argued in our brief, all three. The only reason I'm avoiding the – whether the dots lie at the intersection is because we don't need to go there to affirm the summary judgment. I mean there's a dispute here about whether – how broad or how narrow the gridlines have to be. It's really academic because of the other limitations. But all those three limitations I'm referring to were the process steps in Claim 17 that Judge Selna then said, well, this is a product by process claim. We have to define the product characteristics. And as the court can see from the product characteristics order, this is at A66 and 67, the product characteristics essentially parallel the process steps. And the evidence is that we – that dense splice does not infringe those product steps. Mr. Dillard began with and ended with a discussion regarding the relative merits and demerits of a visual comparison to spectrophotometric data. It's worth pointing out the spectrophotometric data is the way that VIDA asserts their shade guide matches the claims in the patent. They measured it with a spectrophotometer and come up with and confirmed that it does indeed match the claims. Of course, they conducted spectrophotometric measurements of dense splice-accused products, and we've shown that they don't match. And so now they trash spectrophotometric data and favor visual comparison data. This is really set out in the briefs, and I won't obviously cover all that territory. But to the extent Mr. Dillard says that our expert concedes that there's all these problems with spectrophotometric data, it's simply not true. The expert, Dr. White, in question, in the record, explains this is AO4044 in his declaration. What we're talking about here is not whether one spectrophotometer measuring color under some conditions will precisely match under all conditions another spectrophotometer being used by somebody else under different conditions. That's not the issue. The issue here is about whether within a particular data set the relationships match the relationships of the 26 colors claimed in the patent. And if you look at the dense splice measurements and you look at the VITA measurements, while they might not be precisely the same across data sets, the relationships within the data sets are the same. And they show that neither of the three limitations at issue here, the substantially parallel subdivisions of luminance, the points lying at the regular – at the intersections of the regular grid of lines, or the line on the longitudinal axis where the central colors can be lined up, none of those three process steps are met. Unless there's any further questions. Thank you. Thank you, Mr. Shuman. Mr. Dillard. Thank you, Your Honor. A few points. One, with respect to the different requirements of this conceptual color selection technique where you have intersections of grids where you have points located and you have central points located on a longitudinal axis and you've got substantially parallel planes. All of the measurements, whether it's visual or spectrophotometric, of data to characterize whether or not those kind of limitations are met are subject to a level of variance. And frankly, it's incorrect to say that between the two data sets that we were looking at, that the color relationships were just the same. In fact, they weren't in some cases. There were some instances in which a particular color or material was more red than another material in one data set and less red than another. And the differences – it's not just maybe taking one data set and moving it over because of some machine characteristic. The differences were, in some cases, very large. In some cases, the actual relationships were different. So Vito's or Plaintiff's argument is not that spectrophotometric measurements are bad and we're not trashing spectrophotometric measurements. You just need to understand that there are variances involved. And for these particular types of materials, the translucent materials, visual comparisons matches or, according to Dr. White, Jen's Plaintiff's expert, exceeds the ability of spectrophotometric determinations. No, but in trying to understand what has been invented and to consider the claims in that context, that has to include sufficient specificity to determine what's an infringement. And I think I hear you saying that that can't be done based on the measurements that are described in the specification. No, that's not at all what I'm saying. What I am saying is that if you're looking at, for example, we'll take the conceptual grid and you have intersections, that the size of the intersection or that the point has to be large enough that it would encompass colors that are perceived to be identical to the color at the center of that point. So whether it's 2 delta E spectrophotometrically or identical colors from a visual standpoint, you're still talking about a variance of about 2 delta E. And if that was applied, then I think you can, you know, that would be appropriate. There needs to be some variance because, you know, machines are not capable of conceptual precision, which can be infinitely small. Let me just ask you, are you finished answering Judge Newman's question? I discussed with Mr. Shulman, nobody seems very interested in the issue of what kind of claims these are. It's your position that the process steps are not limitations, correct? Yes, sir. They create limitations with respect to the color relationships that are required by the actual materials. But you have to be able to translate from conceptual precision, if you will, to real life. So you're saying we should just look at these as product claims? Yes, sir. And if we were to look at it as a process claim, would there be infringement? Would copying a product made by a process… In other words, if you take the position that they have to follow the precise process steps, is there infringement here? That we have to prove that they conceptualized… That they followed the process steps. Well, the process steps are conceptual in nature. And so we would have to prove that they followed the conceptual process steps, came up with the identical set of colors that we came up with. I think that would be difficult to prove. Okay. Any other questions? Any other questions? Okay. Thank you, Mr. Dillard. Thank you, Mr. Schumer. The case is taken in this hearing.